UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| ANGELA L. LIVINGSTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 6:10-CV-00014-BG |
| ) | ECF |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

### Statement of the Case

Pursuant to 42 U.S.C. § 405(g), Plaintiff Angela L. Livingston seeks judicial review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits. The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. Livingston did not consent to proceed before the United States Magistrate Judge, and therefore the undersigned now files this Report and Recommendation.

An Administrative Law Judge (ALJ) held a hearing on April 30, 2007, and determined on January 18, 2008, that Livingston was not disabled "at any relevant time through the date her insured status expired." (Tr. 35-36, 421.) Specifically, the ALJ held that Livingston had the residual functional capacity (RFC) to "perform the full range of sedentary work, except she could not climb ladders, scaffolds, or ropes; she could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and she could have no more than superficial contact with the public." (Tr.

1

26.) After considering testimony from a vocational expert, the ALJ concluded, "Given Ms. Livingston's age, education, work experience, and residual functional capacity prior to the expiration of her insured status, a significant number of jobs existed in the national economy that she could perform." (Tr. 34-35.)

The Appeals Council denied review on September 21, 2009. (Tr. 8-10.) Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

**Factual Background**

Livingston previously worked as a maid, janitor, client service worker, and facility operations assistant. (Tr. 84.) She currently sells self-written and self-published poetry books from which she has earned an estimated $600 since 2000. (Tr. 89, 426.) She claims that she became disabled on January 1, 2004. (Tr. 24, 439.)

On June 25, 2003, CT scans of Livingston's abdomen revealed that she had a mass lesion in her right kidney and complex cyst in her left kidney. (Tr. 139-41.) Vidya Malhotra, M.D., reviewed the scans and stated that the mass lesion most likely represented "a solid renal neoplasm such as renal cell carcinoma." (Tr. 140.) According to Dr. Malhotra, Livingston also had a mass in her abdomen that might be a neural tumor. (Tr. 140-41.)

On August 25, 2003, Livingston underwent a right nephrectomy for renal cell carcinoma. (Tr. 185.) Bradley McIver, M.D., performed the surgery and diagnosed Livingston with morbid obesity, polycystic ovarian syndrome, borderline hypertension, history of hyperaldosteronism, and history of hypokalemia. *Id.* By August 28, 2003, Livingston was tolerating clear liquids. *Id.* By

2

August 30, 2003, she was tolerating a regular diet and discharged in good condition. (Tr. 185-86.) Upon discharge, she was instructed "not to lift anything heavier than a milk jug for six weeks and no driving for two weeks." (Tr. 186.)

On February 26, 2004, Livingston had a follow-up appointment with Dr. McIver, who reported that she was having occasional discomfort at her incision site. (Tr. 206.) According to Dr. McIver, "This is not a severe bother for her and she feels that this is improving slowly with time." *Id.* On April 22, 2004, she had an appointment with J. Chris Barnett, M.D., who found that she had status post renal cell carcinoma, hypertension, reported hyerlipidemia, obesity, polycystic ovarian syndrome, and athlete's foot. (Tr. 201.) Dr. Barnett noted that Livingston was concerned about her incisional pain and recommended special cream. *Id.*

After a follow-up appointment on July 1, 2004, Dr. McIver reported that Livingston had a normal chest x-ray, keloid scar, and no evidence of disease. (Tr. 198.) On September 22, 2004, a physician examined Livingston for pain in her left shoulder and neck. (Tr. 197.) The physician noted no injury, found that she had a muscle spasm, and instructed her not to lift for two weeks. *Id.* After another appointment on October 1, 2004, Dr. McIver reported that Livingston was "in her usual state of health" with a normal chest x-ray and no evidence of disease. (Tr. 194.) He also noted that her abdomen was "soft and nontender with a well-healed surgical scar." *Id.* On April 8, 2005, Dr. McIver again examined Livingston and reported that she had a normal chest x-ray and "some intermittent pain and discomfort" from her incision, which he found very tender. (Tr. 180.) He noted that Livingston was taking yoga but had less strength than previously. *Id.*

On August 4, 2005, physical therapist Jimmy Villers examined Livingston and evaluated her functional capacity. (Tr. 147-68.) Villers reported that Livingston was "able to work at the Light-

3

Medium Physical Demand Level for an 8 hour day[.]" (Tr. 147.)  He noted that she was "very pleasant and cooperative" during the evaluation.  *Id.*  According to Villers, Livingston reported that she spent approximately six hours per day sleeping or lying down, three hours per day standing or walking, and fifteen hours per day sitting.  (Tr. 152.)  Villers found that Livingston had "moderate pain in the right flank and groin with light pressure."  *Id.*  He also noted that she used a cane to walk, her speed was slow, and she exhibited no limp.  *Id.*  He found that Livingston had excellent fine motor skills.  (Tr. 157.)  On the same date, Dr. Barnett examined Livingston for hypertension and complaints of left thigh pain.  (Tr. 173.)  Dr. Barnett reported that Livingston was pleasant and "in no distress."  *Id.*  He found that she had a history of renal cell carcinoma, mild renal insufficiency, and hypertension.  *Id.*  He ordered laboratory tests and prescribed medication.  *Id.*

On December 19, 2005, Livingston submitted a Daily Activity Questionnaire.  (Tr. 92-94.)  She stated, "It take[s] several days to do chores instead of a few hours.  I must rest frequently."  (Tr. 92.)  According to Livingston, her medication made concentration difficult.  *Id.*  She reported that she did "mild yoga, walking, general mild stretches, [and] mild housework" for exercise.  (Tr. 93.)  She stated, "There is always pain during the exercise.  Once a week I can do a[n] hour of exercis[e] with several breaks within the hour."  *Id.*  When asked to describe what she did on an average day, she reported, "I wake, clean my body, I find something to eat, take my medicine, do light housework, errands, or go to my yoga instructor.  I can usually do 5 minutes of activity before needing to rest.  On good days, I can do mild activity for an hour at one time before resting."  *Id.*

State agency medical consultant (SAMC) Moira Dolan, M.D., reviewed Livingston's case and issued an opinion on her physical RFC on January 19, 2006.  (Tr. 214-21, 242.)  Dr. Dolan found that Livingston could occasionally lift twenty pounds; frequently lift ten pounds; and sit,

4

stand, and/or walk for six hours in an eight-hour workday. (Tr. 215.) Dr. Dolan found no other exertional limitations and noted that Livingston's alleged limitations due to pain were not fully supported by evidence. (Tr. 215-16, 219.) Bob Dodd, M.D., reviewed and affirmed Dr. Dolan's assessment on June 6, 2006. (Tr. 240.)

On April 19, 2006, Livingston submitted another Daily Activity Questionnaire. (Tr. 78-82.) She reported, "Various fears make me isolate and fear approaching tasks. I have anxieties and triggers that cause barriers inhibiting my ability to perform various tasks." (Tr. 78.) She also stated that intrusive thoughts and chronic pain caused "severe sleep deprivation that [made] task performance difficult." *Id.* In addition, she reported that her constant pain limited her ability to reach areas of her body and do proper grooming and created difficulties when washing and dressing. (Tr. 80.) She stated that these limitations caused depression, stress, and anxiety. *Id.*

Regarding her memory, Livingston stated, "If I do not write things down where I can find the listing, I forget. . . . After reading my list, I can forget within the next couple of minutes." (Tr. 81.) Regarding her ability to get along with others, she stated, "I am short with family members. I have a high level of frustration and anxiety that manifests in yelling or crying. I raise my voice a lot. . . . I leave if I have to avoid a person. If I cannot leave, I will become rude or dismissive with the person." *Id.* Regarding her ability to deal with changes in her routine, she stated, "If my plans are changed, I become irritable and snap at loved ones. If I have something come up, it creates problems with my pain management and I become frustrated and overwhelmed." (Tr. 82.) She also stated that her "pain and mental frustration" made her delay when she had to meet a deadline. *Id.*

Notwithstanding these reported limitations, Livingston indicated that she could leave home by herself to go to the store or doctor's appointments, for example. (Tr. 79.) She also stated that

she cooked or reheated one meal every other day, and her mother cooked for her when she was unable. (Tr. 80.) She reported that her mother helped her shop by lifting and carrying items, and her CPA and financial planner helped her handle her money. (Tr. 80-81.) In addition, she went to church once every three or four months, medical appointments several times per month, support groups once per month, out to eat twice per month, and movies twice per year. (Tr. 82.)

On April 25, 2006, licensed counselor Debbie Branek reported that she had seen Livingston in counseling over 60 times since May 2002. (Tr. 32-33, 131.) Branek found that Livingston had obsessive compulsive disorder and a nightmare disorder, which "interfere[d] with her ability to function on a regular basis." (Tr. 131.) Branek also stated that Livingston was "unable to complete many tasks due to her perfectionism." *Id.* According to Branek, Livingston had "mental capabilities as evidenced by her completion of college degrees[,]" but she hoarded worthless items and was "unable to enjoy various things due to her being a miser in her expenditures." *Id.* Branek noted that Livingston used yoga and music to help with stress. *Id.*

SAMC Robert M. Gilliland, M.D., a specialist in general psychiatry, reviewed Livingston's case and issued an opinion on her mental RFC on June 2, 2006. (Tr. 222-39, 243.) Dr. Gilliland found that Livingston had a single moderate episode of major depressive disorder, chronic PTSD, and OCD. (Tr. 229, 231.) He further found that she had mild restriction of activities of daily living; mild difficulties in maintaining concentration, persistence, or pace; and moderate difficulties in maintaining social functioning. (Tr. 236.) According to Dr. Gilliland, these limitations were largely due to Livingston's chronic physical pain. (Tr. 238.) Dr. Gilliland concluded that Livingston was "able to understand and remember detailed but not complex instructions, interact appropriately [with] coworkers and supervisors and adapt to changes in a typical work setting" in spite of her

6

limitations. (Tr. 224.)

On August 14, 2006, Ken Reed, M.D., examined Livingston for flank pain. (Tr. 258-59.) Dr. Reed reported that Livingston had "a long history of generalized body pain which remained under fair control with very conservative management." (Tr. 258.) According to Dr. Reed, she "recovered well" from her nephrectomy but developed "rather severe, constant pain about the flank scar." *Id.* Dr. Reed stated, "[T]he pain is localized about the scar and is characterized as a constant deep aching pain with some spasms with also a constant, severe burning pain about the skin and scar. The area is exquisitely tender and sensitive." *Id.* He found that Livingston had "Complex Regional Pain Syndrome - neuropathic pain with allodynia." *Id.* According to Dr. Reed, this condition was a "severe, absolutely debilitating problem" that would "last for an indefinite period and most likely for at least five to eight more years." *Id.* Dr. Reed prescribed special compound cream and referred Livingston to a doctor who lived nearer to her. (Tr. 259.)

On September 28, 2006, chiropractor and acupuncturist Monty Wright examined and treated Livingston for pain in her abdomen, back, and shoulder. (Tr. 272-73.) Wright noted that she rated her abdominal pain due to her scar at 10/10 and was alert and cooperative during the examination. (Tr. 272.) According to Wright, "Her recent and remote memory, attention span[,] and concentration appeared normal" but she was distressed by her abdominal pain. *Id.* Wright noted significant tenderness at Livingston's abdominal scar. (Tr. 273.) He found that she had chronic abdominal pain with thoracic radiculitis and extreme sensitivity to her scar formation. *Id.* From May 2006 to April 2007, Livingston received treatment for neck, shoulder, back, and abdominal pain from a chiropractor and/or acupuncturist on at least sixteen occasions. (Tr. 245-47, 268-73, 296-301.)

7

Livingston received counseling from licensed counselor Carol J. Jeffers from December 13, 2006, to February 26, 2007. (Tr. 414-18.) Jeffers reported that Livingston was articulate, cooperative, polite, and well-groomed at her appointments. (Tr. 414-18.) According to Jeffers, Livingston was frustrated and showed signs of depression at some appointments, but she never displayed signs of anxiety or psychosis. *Id.*

On March 8, 2007, Livingston went to the emergency room for flank pain. (308-09.) One physician noted that she seemed depressed. *Id.* A CT scan of Livingston's chest revealed no evidence of a pulmonary embolus. (Tr. 313.) An ultrasound of her gallbladder was also unremarkable. (Tr. 306.) Kenneth E. Breedlove, M.D., reviewed a CT scan of Livingston's abdomen and reported that she had a lesion in her left kidney that "could represent an area of scar" but required further examination. (Tr. 315-16.) Dr. Breedlove also found fatty infiltration of the liver and "[n]o evidence for inflammatory change within the abdomen." (Tr. 315-16.) Livingston was discharged in stable condition. (Tr. 309.)

On April 19, 2007, physical therapist Jimmy Villers again examined Livingston and evaluated her functional capacity. (Tr. 335-53.) He reported that Livingston was "able to work at the Sedentary-Light Physical Demand Level for an 8 hour day[.]" (Tr. 335.) He noted that she was "very pleasant and cooperative during the evaluation." *Id.* According to Villers, Livingston reported that she spent around ten hours per day sleeping or lying down, two hours per day standing or walking, and twelve hours per day sitting. (Tr. 341.)

On April 30, 2007, Livingston testified at a hearing before the ALJ, where she was represented by a non-attorney representative. (Tr. 24, 421-47.) She was last insured on June 30, 2007. (Tr. 25.)

## Standard of Review

A plaintiff is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (2011).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007); *see also* 20 C.F.R. § 404.1520(a)(4) (2011). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's RFC, defined as "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 404.1520(a)(4)(iv)-(v) (2011).

Judicial review of a decision by the Commissioner is limited to two inquiries: a court must "consider only whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447; 42 U.S.C. § 405(g) (2011) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

9

adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

## Discussion

Livingston argues that the ALJ did not apply the appropriate legal standards when evaluating her mental impairment. (Pl.'s Br. 4.) Specifically, she complains that the ALJ did not comply with sections 404.1520a, 404.1545, and 404.1527 of the governing regulations. (Pl.'s Br. 5-13.) Livingston argues that she was prejudiced by these alleged errors because "the ALJ's RFC finding is unsupported by substantial evidence." (Pl.'s Br. 14.)

I.  Livingston's Arguments

Section 404.1520a requires an ALJ to rate the degree of limitation resulting from a claimant's medically determinable mental impairments in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See* 20 C.F.R. §§ 404.1520a(b)(2), 404.1520a(c)(3) (2011). The ALJ's decision "must include a specific finding as to the degree of limitation" in each of these functional areas. *Id.* § 404.1520a(e)(2). Livingston argues that the ALJ's analysis does not comply with these regulations because it "contains no ratings of [her] functional losses" in these four categories. (Pl.'s Br. 6.)

Section 404.1545(a)(4) requires an ALJ to "consider [a claimant's] ability to meet the physical, mental, sensory, and other requirements of work[.]" *Id.* at § 404.1545(a)(4). The regulations add, "A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting may reduce your ability to do past

10

work and other work." *Id.* at § 404.1545(c). Social Security Ruling 96-8p adds, "Work-related mental activities generally required by competitive, remunerative work include the abilities to[] understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting." SSR 96-8p, 1996 WL 374184 at *6 (July 2, 1996). Livingston argues that the ALJ "did not make a detailed assessment of [her] abilities to understand, remember, and carry out instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work pressure in a work setting; or [] deal with changes in a routine work setting." (Pl.'s Br. 9.)

Section 404.1527 requires an ALJ to "consider findings and other opinions of State agency medical and psychological consultants[.]" 20 C.F.R. § 404.1527(f)(2)(i) (2011). However, an ALJ is not bound by any findings made by those individuals. *Id.* Unless an ALJ gives controlling weight to a treating source's opinion, he "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant[.]" *Id.* at § 404.1527(f)(2)(ii). When considering these opinions, an ALJ must use the following criteria: the examining or treatment relationship between the source and the claimant; the length, frequency, and nature of the relationship; the extent to which the opinion is supported by relevant evidence and consistent with the record as a whole; and the specialty of the source, if any. *Id.* at §§ 404.1527(f)(2)(iii), 404.1527(d). According to Social Security Ruling 96-6p, an ALJ "must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant[.]" SSR 96-6p, 1996 WL 374180 at *4 (July 2, 1996). Livingston argues that the ALJ erred in that he did not cite to section 404.1527 when considering Dr. Gilliland's June 2006 opinion "or name any of

11

the factors identified by the regulation as relevant to the weight assigned to medical opinions." (Pl.'s Br. 10, 12.)

This court doubts "whether the circumstances at issue in this case fall within the letter or spirit" of section 404.1527 or SSR 96-6p. *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001). Neither section 404.1527 nor SSR 96-6p requires the ALJ to include a specific finding as to each of the identified criteria. In the section describing his Step 3 analysis, the ALJ stated, "In this case, [the SAMC] opinions were well supported by, and consistent with, the remaining credible medical evidence, particularly the objective medical evidence. Therefore, in this case I gave those opinions significant weight." (Tr. 26.) This explanation of the weight given to the SAMC opinions complies with section 404.1527 and SSR 96-6p, which by their terms do not require the ALJ to repeat this explanation at other portions of his decision, including his RFC assessment.

## II.     Harmless Error

In general, "where the rights of individuals are affected, an agency must follow its own procedure, even where the internal procedures are more rigorous than otherwise would be required." *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981). However, the Court of Appeals for the Fifth Circuit requires "a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision." *Shave*, 238 F.3d at 597. Thus, an ALJ "is not always required to do an exhaustive point-by-point discussion" to comply with a regulation. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). Procedural perfection is not required "as long as 'the substantial rights of a party have not been affected.'" *Id.* (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Accordingly, alleged improprieties in Social Security administrative proceedings "constitute a basis

for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

Livingston argues that the ALJ's alleged errors affected her substantial rights because substantial evidence does not support the ALJ's RFC determination. (Pl.'s Br. 14.) As previously discussed, the ALJ found that Livingston had the RFC to "perform the full range of sedentary work, except she could not climb ladders, scaffolds, or ropes; she could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and she could have no more than superficial contact with the public." (Tr. 26.) Livingston objects only to the portion of the RFC determination regarding her "remaining abilities to perform work-related mental activities[,]" *i.e.*, the portion stating that she should have "no more than superficial contact with the public." (Pl.'s Br. 13.) She argues that the ALJ should have "articulated more precise limitations and incorporated them into the RFC" but she does not articulate the mental limitations she contends exist. *Id.*

Substantial evidence supports the ALJ's finding that Livingston had not "exhibited significant mental limitations" other than the need to "have only superficial contact with the public." (Tr. 28.) For example, on August 4, 2005, and April 19, 2007, a physical therapist evaluated Livingston's functional capacity and noted that she was "very pleasant and cooperative" during the evaluations. (Tr. 147, 335.) On December 19, 2005, Livingston reported that she did light housework, errands, or yoga on an average day and on good days performed mild activity an hour at a time before resting. (Tr. 93.) She could leave home by herself, cook or reheat one meal every other day, work with a CPA and financial planner, attend church on occasion, go to medical appointments several times per month, attend monthly support groups, eat out twice monthly, and see movies twice a year. (Tr. 79-82.)

As noted by the ALJ, on April 25, 2006, one of Livingston's treating counselors reported that Livingston had "mental capabilities as evidenced by her completion of college degrees." (Tr. 32-33, 131.) That counselor also reported that Livingston used yoga and music to help with stress. (Tr. 131.) As also noted by the ALJ, Livingston's other treating counselor reported that Livingston was friendly, cooperative, active, well-groomed, and informative at her appointments from December 13, 2006, to February 26, 2007. (Tr. 34, 414-18.) In addition, the ALJ noted reports from Livingston's chiropractor and acupuncturist that she was "alert and cooperative" in spite of pain that she rated 10/10 on September 28, 2006. (Tr. 33, 272.) The chiropractor reported that her recent and remote memory, attention span, and concentration appeared normal. (Tr. 33, 272.) The ALJ further noted that Livingston testified that she could read and work on the computer (provided she took sufficient breaks), drive a car, attend a monthly cancer support group and monthly writing group, and go grocery shopping on a monthly basis. (Tr. 27, 434-36.)

Of particular note, Dr. Gilliland, an SAMC, concluded on June 2, 2006, that Livingston was "able to understand and remember detailed but not complex instructions, interact appropriately [with] coworkers and supervisors and adapt to changes in a typical work setting" in spite of her impairments. (Tr. 224.) Dr. Gilliland reasoned that the alleged severity of Livingston's mental limitations was not supported by the evidence of record. *Id.* He noted that she was independent in her personal care, did housework, owned a car and drove, cooked, handled her own finances, shopped, watched television, did yoga, and had a boyfriend and other friends that she saw occasionally. (Tr. 238.) He also noted that at a mental status exam on May 22, 2006, Livingston's remote memory, recent memory, attention, concentration, judgment, and insight were all intact. *Id.*

14

The ALJ gave the SAMC opinions in this case "significant weight." (Tr. 26.) The ALJ's finding that Livingston had not exhibited significant mental limitations other than the need to have only superficial contact with the public is consistent with Dr. Gilliland's conclusions. (Tr. 28, 224.)[1]

For the foregoing reasons, substantial evidence supports the ALJ's RFC determination. Accordingly, the ALJ's allegedly insufficient evaluation and discussion of Livingston's mental impairment does not constitute a basis for remand. *See Morris*, 864 F.2d at 335.

## Conclusion

For the foregoing reasons, this court recommends that the United States District Court affirm the Commissioner's decision and **DISMISS** Plaintiff's complaint with prejudice.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2011); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs*.

---

[1] Livingston argues that the ALJ "impermissibly relied on his own medical opinions as to the mental limitations imposed by her mental impairments" and "arbitrarily decided her mental RFC without any expert medical advice." (Pl.'s Br.13-14.) This argument is without merit because the ALJ's assessment is consistent with Dr. Gilliland's statements regarding the effect that Livingston's conditions had on her ability to work. *Compare Ripley v. Chater*, 67 F.3d 552, 557-58 (5th Cir. 1995) (holding that remand was required because the record did not contain reports from qualified medical experts regarding "the effect [the claimant's] condition had on his ability to work").

15

*Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

      Dated:      August 16, 2011.

_____
NANCY M. KOENIG
United States Magistrate Judge